1  Thomas B. Mayhew (State Bar No. 183539)
   tmayhew@fbm.com
2  Thomas J. Pardini (State Bar No. 313401)
   tpardini@fbm.com
3  Farella Braun + Martel LLP
   One Bush Street, Suite 900
4  San Francisco, California 94104
   Telephone: (415) 954-4400
5  Facsimile: (415) 954-4480

6  Attorneys for UNIVERSITY GAMES
   CORPORATION

7

8                    UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11  UNIVERSITY GAMES CORPORATION,          Case No. 3:23-cv-05583

12             Plaintiff,                  **COMPLAINT FOR DECLARATORY
                                           RELIEF, BREACH OF CONTRACT,
13        vs.                              BREACH OF FIDUCIARY DUTY,
                                           FRAUD, AND INDEMNIFICATION**
14  FORBIDDEN GAMES, INC.; and GLENN
    DROVER,                                **DEMAND FOR JURY TRIAL**
15
               Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

44205\16457343.2

I.       **SUMMARY OF ACTION**

1.       University Games Corporation ("UGC") brings this action against Defendants Forbidden Games, Inc., and its President and CEO Glenn Drover (collectively, "Defendants").  In April 2022, the parties executed an Asset Purchase Agreement under which UGC purchased the assets and intellectual property of Forbidden Games.  Drover also became an employee of UGC to design board games and manage UGC's Strategy Game Division.

2.       About a year later, Glenn Drover resigned from UGC.  Both before and after his resignation, Forbidden Games and Glenn Drover breached their contractual obligations and Drover breached his fiduciary duties of loyalty and good faith and committed fraud.  Defendants' breaches of their contractual and fiduciary obligations included, among other things, failing to transfer the assets and intellectual property as required by the contract, failing to transfer monetary proceeds to UGC's account, refusing to work with UGC under the terms the parties had negotiated, holding UGC's game development hostage until Drover's increasing monetary demands were met, chronically violating University Games procedures and policies, interfering with the development and launch of UGC games, refusing to return company property after Drover's resignation, and claiming that the intellectual property Drover and Forbidden Games had transferred to UGC actually belonged to Drover.

3.       To protect its rights, UGC brings this action for declaratory relief, breach of contract, breach of fiduciary duty, fraud, and indemnification.

II.      **PARTIES**

4.       Plaintiff University Games Corporation is and at all times mentioned was a corporation organized and existing under California law, with its principal place of business in San Francisco, California, and qualified to do business in California.  University Games designs, creates, and markets games that encourage fun, learning, social interaction, and imagination through innovative gameplay.

5.       Defendant Forbidden Games, Inc. is and at all times mentioned was a corporation organized and existing under Illinois law, with its principal place of business in Illinois, and conducted business in San Francisco, California.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT                      2                      44205\16457343.2
Case No. 3:23-cv-05583

6.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Glenn Drover is and at all times mentioned was the President and CEO of Forbidden Games, Inc., and is an individual residing in Illinois and is a citizen thereof.

## III.   JURISDICTION

7.     This Court has diversity subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. Section 1332(a) and (c) because Plaintiff and Defendants are citizens of different States, and the amount in controversy exceeds $75,000.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, as is more fully explained herein.  Defendants' wrongful actions that give rise to the claims either occurred in, or substantially caused harm in, California.

9.     Additionally, personal jurisdiction over Defendants and venue is also proper because in the Asset Purchase Agreement ("APA"), the parties agreed that "[a]ll actions and proceedings arising out of or relating to this Agreement will be heard and determined in a state or a federal court located in the City and County of San Francisco, California."  (Exhibit A, APA at § 10.5 "Governing Law.")  In addition, the parties to the Asset Purchase Agreement agreed to "hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding."  (*Id*.)  Moreover, in all contracts at issue in this Complaint that were signed by either Defendant, California was chosen as the governing law for any disputes.

## IV.   DIVISIONAL ASSIGNMENT

10.     Pursuant to Civil Local Rule 3-5 and 3-2(c), this case should be assigned to the San Francisco division because a substantial part of the events or omissions giving rise to the claims occurred in San Francisco, and a substantial part of the property that is the subject of the action is situated in San Francisco.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

3

44205\16457343.2

## V.    FACTUAL ALLEGATIONS

### A.    University Games Corporation Acquires Forbidden Games.

11.    University Games Corporation ("UGC") was founded by Bob Moog and Cris Lehman in 1985.  By the end of the 1990s, UGC had successfully expanded to markets outside the United States; its products are distributed in more than 28 countries and the company now has offices in the United Kingdom and Australia.  UGC became a major player in the international game industry through broad distribution, experienced staff, and strategic acquisitions.  UGC has won numerous toy awards from Parent's Choice, Family Fun Magazine, Child Magazine, Parenting Magazine and Dr. Toy.  UGC sells its products to large retailers ranging from Walmart, Target, Barnes & Noble, and Amazon to small, independent specialty retailers.  The company philosophy has always been to offer games that encourage social interaction, imagination, and learning through innovative gameplay.

12.    In early 2022, UGC became interested in acquiring the assets of Forbidden Games, Inc., a board game publishing company founded by Glenn Drover.  To that end, the parties entered into a "Memorandum of Understanding for Purchase of Assets of Forbidden Games by University Games," on February 17, 2022.  This MOU was signed by Bob Moog on behalf of UGC and Glenn Drover on behalf of Forbidden Games.  In the MOU, the parties agreed that they intended for UGC to "acquire substantially all of the assets of Forbidden Games Inc, . . . including any and all products and product lines."  The MOU stated that these assets included "all intellectual property or of relating to the [Forbidden Games] business," and "this includes all intellectual property registered in the name of Glenn Drover or others."

13.    On April 20, 2022, UGC and Forbidden Games entered into an Asset Purchase Agreement ("APA") under which UGC would acquire "all of Seller's right, title and interest (whether beneficial or of record) in, to and under the Acquired Assets," which means "all assets, properties and rights of Seller used in the Acquired Business," and specifically included "[t]he Acquired Products, the Acquired IP and all of Seller's rights to the Acquired Products and the Acquired IP."  (Exhibit A, APA at § 2.1.)  It also included "all marketing and promotional materials related to the Acquired Products or the Acquired Business."  (*Id.*)  One of the Acquired

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

4

44205\16457343.2

1  Products was "Faeries (Kickstarter Q2 2023)," one of the New Titles in Development 2021-2025

2  that UGC acquired.  This APA was signed by Bob Moog on behalf of UGC and Glenn Drover on

3  behalf of Forbidden Games.

4       14.     In exchange for substantially all of Forbidden Games' assets, properties, and rights,

5  UGC would pay Forbidden Games a certain amount of money at closing, followed by a first post-

6  transaction payment on or before February 28, 2023 ("first post-transaction payment"), and an

7  additional post-transaction payment on or before February 29, 2024 ("second post-transaction

8  payment"), as well as a percentage of Adjusted Gross Revenue from the Acquired Products,

9  capped at a maximum payment of various amounts during certain time periods.  (Exhibit A, APA

10  at § 2.7(a)-(g).)  The amount of money involved in this transaction was significantly more than

11  $75,000.

12       15.     Forbidden Games asserted that it had "full company power to execute and deliver

13  this Agreement and the Other Transaction Documents required to be executed by it and to effect

14  the transactions contemplated by this Agreement and such Other Transaction Documents."

15  (Exhibit A, APA at § 3.1.)  Glenn Drover and Forbidden Games made numerous other

16  representations in the APA that Forbidden Games had the power to transfer all of its intellectual

17  property free and clear to UGC.  (*See* Exhibit A, APA at § 3.6.)

18       16.     The APA attached multiple other transaction documents, including the: (a)

19  Assignment and Assumption Agreement, (b) Bill of Sale, (c) Proprietary Rights Assignment, and

20  (d) Non-Compete and Non-Solicitation Agreement.  These documents further formalized the

21  transfer of Forbidden Games' assets to UGC and each party's respective rights and obligations

22  under the contract.

23       17.     In the Bill of Sale, signed by both Glenn Drover and Bob Moog on behalf of their

24  respective companies, the parties agreed that "Purchaser hereby purchases from Seller and Seller

25  hereby sells, transfers, conveys, assigns and delivers to Purchaser all of Seller's right title and

26  interest in and to all of the Acquired Assets free and clear of any Encumbrances, except such

27  Encumbrances as are expressly approved by Purchaser."  Seller also agreed to "execute and

28  deliver to Purchaser such other instruments of sale, transfer, conveyance, assignment and

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT                     5                     44205\16457343.2
Case No. 3:23-cv-05583

confirmation, as Purchaser may reasonably request to effectively transfer, convey and assign to Purchaser, and to confirm Purchaser's title to, all of the Acquired Assets, and otherwise to cause Seller to fulfill its obligations under the Asset Purchase Agreement."

18.     In the Proprietary Rights Assignment, signed by both Glenn Drover and Bob Moog on behalf of their respective companies, the parties agreed that "The Seller hereby sells, transfers and assigns to Purchaser all of Seller's right, title, and interest in and to the Intellectual Property Rights in and to the Acquired IP (as defined in Section 1.1 of the Asset Purchase Agreement)," including without limitation a lengthy list of transferred intellectual property.  This list included copyrights, trademarks, Internet domain names, advertising and promotional materials, formats and designs, and customer lists, among many other categories of intellectual property.  And just like in the Bill of Sale, Seller also agreed to "execute and deliver to Purchaser any documentation or filings necessary to effectuate the transfer of the Intellectual Property to the Purchaser to be filed with the U.S. Patent and Trademark Office, U.S. Copyright Office or other Governmental Body."

19.     In the Non-Compete and Non-Solicitation Agreement, signed by both Glenn Drover and Bob Moog on behalf of their respective companies as well as by Glenn Drover in his individual capacity as a Shareholder of Forbidden Games, the parties agreed that Forbidden Games and Drover would, for the period beginning on April 20, 2022 through December 31, 2025, not compete with UGC in the game development business and specifically would not "develop, sell, market and/or distribute, anywhere in the Restricted Territory (as defined below), any games which have substantially similar names or have similar look and feel to the games which are included in the Acquired Assets purchased by Purchaser under the Purchase Agreement (a 'Competing Business Purpose'); or (b) be or become an officer, director, member, owner, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, any firm, partnership, corporation, person, entity or business that engages or participates in a Competing Business Purpose in the Restricted Territory; or (c)

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

contact, solicit or communicate with Purchaser's customers, or Seller's customers as of the date hereof, in connection with a Competing Business Purpose."

20.     Drover also signed, in his individual capacity, an Employment Offer to become the Vice-President of the Strategy Game Division at UGC.  The Employment Offer stated that his job description was "to develop a global program of strategy games" and "to successfully and profitably manage the annual sales budget, build the Forbidden Games portfolio, expand Forbidden Games to new channels and markets, launch new games through crowdsourcing, create and execute a marketing plan and work with the UG team to manufacture the product line and achieve target margin goals."

21.     Drover also signed, in his individual capacity, an Employee Confidential Information and Inventions Agreement (CIIA) in which he promised to keep company information confidential.  He also "hereby assign[ed] to [UGC], without further consideration, my entire right, title, and interest (throughout the United States and in all foreign countries), free and clear of all liens and encumbrances, in and to all Inventions, including any patents, copyrights, trademarks, rights, and claims related to the Inventions. The Inventions shall be the sole property of the Company, whether or not copyrightable or patentable. The Inventions shall be considered 'works made for hire' for the Company as that term is used in the Copyright Act."  In this CIIA, "Inventions" was defined as "any idea, process, invention, technology, design, formula, or discovery, or any improvements to the foregoing, that are conceived, developed, or reduced to practice by me, alone or with others, during any period when I had or have an employment, consulting, officer, director or other relationship with the Company, except any invention excluded below."  Mr. Drover agreed that he noted on Schedule A any invention he wanted to exclude from this agreement; no inventions were listed on Schedule A.  The CIIA also required Mr. Drover to assign to UGC all social media accounts used for UGC business, and to promptly return to UGC all company property and social media accounts upon the termination of his employment.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

**B.**     **Mr. Drover's Employment and Resignation.**

22.     Under these contractual obligations, Mr. Drover began employment at University Games Corporation and the parties began working together on various game titles.  The first project was a game called "Mosaic: War and Disaster," which was developed during Drover's first few months with UGC.

23.     Next, the parties worked together on the principal game in development, which was the "Faeries" game referred to in the Asset Purchase Agreement as "Faeries (Kickstarter Q2 2023)," one of the New Titles in Development 2021-2025 that UGC acquired.  However, issues began to emerge with the parties' working relationship.

24.     By the end of 2022 and throughout 2023, Glenn Drover was not performing his job duties satisfactorily.  UGC's other employees spent hours every week managing and performing many aspects of Drover's job duties and responsibilities.  Because Drover began insisting that he should only be responsible for game design and that he would not be able to keep the schedule for Faeries if he needed to spend time on his other responsibilities, other employees had to pick up Drover's slack.  The tasks undertaken by other UGC employees included planning and monitoring inventory and shipments, preparing reports and projections for the Strategy Game Division that Drover was supposed to be running, game product development, supporting customer service with respect to inquiries from consumers about Kickstarter campaigns[1] (including inquiries regarding the pre-acquisition Kickstarter campaign that Forbidden Games completed), working with vendors to make international shipments, marketing and sales support, planning and execution, working with international distributors, communications with UGC's international subsidiaries, managing fulfillment of Kickstarter campaigns, hiring and managing marketing agencies, overseeing the Kickstarter launch of the Faeries game, proofreading the components of the Faeries game and

---

[1] Kickstarter is a platform designed to crowdsource funding for creative projects.  It is frequently used in the games industry to fund game development and deliver the completed game to interested customers.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

44205\16457343.2

proofreading and approving proofs of the Mosaic Expansion product that Drover was supposed to be managing, and organizing the payment of invoices for vendors.

25.     Drover also refused to use his company email account and instead insisted on using his personal Gmail account for his work responsibilities.

26.     Besides not performing his job responsibilities, Mr. Drover also began to indicate to UGC management that he did not have the funds to cover his obligations to University Games and third parties.  He requested that UGC accelerate the first post-transaction payment described in the APA, which was initially set to be due February 2023.  Reluctantly, UGC agreed to accelerate this first post-transaction payment.  After deductions for Forbidden Games and Drover's outstanding costs and payments to UGC, many of which were related to UGC's assistance in completing a Kickstarter campaign that Forbidden Games had collected money for pre-acquisition, the final amount of the first post-transaction payment was only about 15% of the amount contemplated in the APA.  UGC wrote a check to Forbidden Games in this amount on or around November 2, 2022.

27.     In addition, Drover began expressing discontent with his employment deal and trying to renegotiate the contracts he had already signed with UGC.  UGC's President Bob Moog became increasingly concerned about Drover's commitment to the company and to the deal they had negotiated.  Mr. Moog and UGC were worried that the Faeries game in development would not be completed in time for Gen Con, a gaming convention that was a critical public relations event for the game.

28.     On January 6, 2023, Bob Moog, Glenn Drover, and Craig Hendrickson met at University Games' San Francisco office for several hours and reviewed product plans, implementation schedules, and the delivery forecast for Faeries and other games for 2023.  At this meeting, Moog explained to Drover that Drover was responsible for bringing the Faeries game to market on schedule.  Drover presented a proposed budget, and Moog reminded Drover that any authorization for a budget change would require a written proposal.  The line items of the proposed budget were discussed, including budgets for illustrations and graphic designs.  Moog reminded Drover that any expenses incurred by the Company required a signed purchase order.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

9

44205\16457343.2

The parties instead discussed other options besides the proposed budget that Drover had suggested.

29.     Two days later, Drover emailed Bob Moog to elaborate on the proposal he had suggested in the January 6 meeting.  Drover wrote that he still wanted to "ensure a smooth and effective transition after the acquisition," but he was "less sure that I am a fit for UG's company culture, and believe that I would be most effective operating somewhat outside the daily operations of the company."  And although the parties already had negotiated a working arrangement completely described in the completed acquisition documents and Drover's employment materials, Drover unilaterally proposed new working structures that he claimed would allow the parties to cooperate more effectively.  He attached these proposals as Options 1 and 2 in a "Forbidden Games Product Development Proposal."

30.     In "Option 1" of Drover's Product Development Proposal, Drover proposed that he would resign from his current position and form a new company called The Forbidden Studio LLC, which would then sign an exclusive development deal with UGC in which UGC would pay at least $450,000 for new game designs that Forbidden Studio would have sole creative control over.  In "Option 2" of Drover's Product Development Proposal, Drover's title would change to Vice President of Strategy Game Design, in which he would exclusively focus on "game design and development for the Forbidden Games Brand," he would receive a new higher salary, and UGC would hire someone else to do the job responsibilities that Drover had decided he didn't want to do anymore.

31.     UGC's management interpreted both these proposed "Options" as Drover's unilateral decision to backtrack on the original deal structure to propose new working arrangements and new economic terms that Drover preferred.  While Drover would have been within his rights to resign, he was not within his rights to simply pretend as if the original transaction had never taken place and cause issues for UGC unless UGC agreed to start over negotiations from scratch.

32.     In or around March 2023, Drover also began to ask that UGC accelerate the second post-transaction payment, which was set by the APA to be due in February 2024, so that he could

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

10

44205\16457343.2

pay off his investors.  But Forbidden Games still owed UGC payments for various expenses. Therefore, UGC required that Forbidden Games make those payments before UGC would accelerate the second post-transaction payment, but Drover would not pay those.  Instead, he insisted that Forbidden Games' expenses should simply be deducted from the second post-transaction payment that had been initially set for February 2024.

33.  After disagreements about whether Forbidden Games' payments would be paid before that accelerated second post-transaction payment or deducted from that second post-transaction payment directly, Drover emailed Moog on March 24, 2023 stating that "working at UG is simply not a fit for me," and that "I resign effective immediately."

34.  Despite this resignation email, the parties came to an agreement the next day that Drover would remain an employee with full salary and medical benefits through April 15, 2023, that Drover would pay various overdue invoices, and that UGC would accelerate the second-post transaction payment initially set for February 2024.  The parties also agreed that Drover would complete and deliver the "Faeries" game (now called "Faeries & Magical Creatures") that had been in development and which had an initial deadline of March 30, 2023 for the final game design and art files to be complete.  Drover did not deliver this final game design and art files until April 16, 2023.

35.  On April 18, 2023, UGC transferred the second post-transaction payment to Forbidden Games' account, minus some expenses.  Prior to making this second post-transaction payment on an accelerated schedule, Drover and Moog agreed to a small hold-back for "odds and ends" that Drover still owed to UGC, but which he estimated would not exceed a certain amount.

36.  To date, the "odds and ends" that Drover claimed would be minimal have totaled multiples of what Drover estimated, and Drover continues to refuse to pay money he owes UGC under the APA.  Drover knew at the time that he accepted the second post-transaction payment that Forbidden Games owed more money to University Games, but chose not to disclose this to University Games or Bob Moog.

37.  Up until April 15, 2023, Drover continued to be paid the salary agreed to in his Employment Offer Letter, and his salary checks were all cashed.  Despite the salary payments to

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

11

44205\16457343.2

Drover and the second-post transaction payment to Forbidden Games, Drover began demanding an additional $70,000 for delivering the Faeries & Magical Creatures game.  He claimed that he was entitled to that $70,000 in addition to his normal salary based on an oral agreement he claimed was reached in the January 2023 meeting and his subsequent email.  Drover demanded this additional $70,000 even though no agreement was ever reached for that sum.  Drover also neglected to mention his expectation of the $70,000 during the four months leading up to his demand or discuss at any time any agreed timing for that payment.

38.     Drover left UGC's employment on April 15, 2023.  In the weeks and months following his departure from UGC, he attended several gaming conventions, including the GAMA Expo in Reno and the Gen Con show in Indianapolis.  Although all of his and Forbidden Games' intellectual property had been or should have been transferred to UGC by that time, and although he was no longer working for UGC and had agreed not to compete with it, he still attended these gaming conventions and, upon information and belief, met with UGC customers, contacts, and competitors at these conventions.  UGC does not know why he chose to attend these conventions and speak with people in the industry, but suspects that Drover may be pitching to competitors the games he was supposed to develop for UGC, in violation of his contractual obligations.

39.     The Faeries & Magical Creatures game was set to be finalized and the materials released to the printer in mid-May 2023 (the deadline had to be moved back twice due to Drover's delays).  However, on or around May 5, 2023, Drover objected to the use of his name in any marketing or sales of the Faeries & Magical Creatures game that was set to be released in the next week.  UGC had acquired the right to use Drover's and Forbidden Games' names on its materials in the APA and associated transaction documents, and the use of Drover's name on the packaging and marketing materials had been pre-approved by Glenn Drover and provided under Drover's direction while an employee of UGC.  Moreover, changing that marketing and packaging could not be done without incurring costs.  UGC asked Drover to bear those costs of changing the packaging, and Drover refused.

40.     On or around May 11, 2023, Drover's attorney sent two letters to UGC.  One was a cease-and-desist letter demanding that UGC "cease and desist any and all production,

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583                                    12                              44205\16457343.2

1  manufacture, marketing, merchandising or sale of merchandise using the name and copyrighted

2  materials of Glenn F. Drover, Jr." (Exhibit B, Cease & Desist Letter.) The letter claimed that

3  UGC's production and distribution of Faeries & Magical Creatures or any other product

4  incorporating Drover's name, text creations, rulesets, or other written materials violates the law

5  because they are Drover's "sole copyrighted written materials." (*Id.*)

6       41.    Drover's attorney also attached a letter explaining Drover's position and recitation

7  of the facts since December 2022, including why Drover claimed he was entitled to an additional

8  $70,000. In that letter, Drover's attorney asserted again that UGC should "not produce, market,

9  sell, or crowdsource [Drover's] intellectual property," expressing Drover's position that these

10  materials were his own intellectual property. In the alternative, the attorney asked for the

11  immediate payment of $70,000. The letter also stated that there was nothing in Drover's

12  employment description that required him to design board games for UGC, and that the $70,000

13  extra payment was the parties' additional agreement in January 2023 that he do so. UGC

14  responded with a letter disagreeing with the assertions in Drover's letter.

15       42.    Throughout 2023, and particularly from the time when Drover first began

16  demanding the additional $70,000, UGC attempted to resolve these issues with Drover directly.

17  Bob Moog and Jeff Pinsker met with Drover on April 24 at the GAMA Expo in Reno to discuss

18  the additional $70,000 and attempt to reach a solution. After several attempts to talk to Drover,

19  Drover told them to stop talking to him and to go directly through his attorney. Drover also told

20  UGC employees to talk only to his attorney. Once UGC received the cease-and-desist letter from

21  Drover's attorney, those informal attempts at resolution between the parties ended, although they

22  continued between the parties' counsel. To date, there has never been any attempted explanation

23  from either Drover or his counsel as to why Drover believes he has ownership of any of any of

24  UGC's products, game titles, mailing lists, websites, or intellectual property. But Drover and his

25  attorneys in repeated communications have referred to this material, as well as the Faeries &

26  Magical Creatures title and product, as Drover's intellectual property.

27

28

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

13

44205\16457343.2

C.    **Defendants' Misrepresentations and Subsequent Failures to Transfer Their Assets and Intellectual Property to UGC in Violation of the APA.**

43.    As described above, the APA was an Asset Purchase Agreement in which Forbidden Games and Drover were required to assign the majority of their assets and intellectual property to UGC. Yet Defendants made multiple material misrepresentations at the time they entered into the contract in order to induce UGC to enter into the agreement, and Defendants made false promises they had no intention of keeping.

44.    When UGC acquired Forbidden Games in April of 2022, Forbidden Games had recently completed a Kickstarter campaign and was in the process of collecting shipping funds from backers. Per the terms of the APA, Drover and Forbidden Games were obligated to switch their Stripe account (which processes customer payments) from Forbidden Games' bank account to UGC's bank account. On April 21, 2022, Mr. Drover forwarded a confirmation email from Stripe to UGC's Chief Financial Officer Margaret Fenton that the bank accounts had been switched from Forbidden Games' bank account to UGC's bank account. From that point on, the funds should have been flowing into UGC's bank account.

45.    However, there are no records of any payments to UGC via Stripe from this Kickstarter campaign. For the period from April – December 2022, upon information and belief and a reasonable investigation, the payments that should have been made to UGC were instead made to Forbidden Games' bank account. It appears that Drover, unbeknownst to UGC and after forwarding the confirmation email from Stripe, secretly switched the bank account back to Forbidden Games. Upon information and belief, Forbidden Games then directly received the proceeds from the Kickstarter campaign that should have been going into UGC's bank account.

46.    As another misrepresentation, Defendants did not disclose all their pre-existing liabilities during the negotiation of the APA, and then after the transaction, attempted to have UGC pay those liabilities. In Section 3.10 of the APA, Forbidden Games asserted that "Seller does not have any Liabilities," except for those listed on the Balance Sheet, "immaterial Liabilities," and those disclosed in the APA. (Exhibit A, APA at § 3.1.) However, after the transaction, UGC learned of additional liabilities that had never been disclosed. These included

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

44205\16457343.2

expenses related to inventory adjustments, customer claims, and outstanding debts, which Defendants asserted post-transaction they did not have the funds to pay.  In some circumstances, UGC paid those pre-existing liabilities that had not been disclosed in order to protect working relationships with suppliers and customers.  In addition, in Section 3.7 of the APA, Defendants were required to list in Schedule 3.7(a) all material contracts, including those "relating to the purchase of goods or services in excess of" a certain amount.  (Exhibit A, APA at § 3.7.) Defendants did not include all such contracts in Schedule 3.7(a) and did not disclose to UGC that it had certain outstanding obligations far exceeding the listed amount.

47.     As another misrepresentation, Drover included on Exhibit A to the APA a list of "New Titles in Development 2021-2025" that Drover represented were in development by Forbidden Games, but Drover knew that many of these items were not in development at all and had never been started.

48.     As another misrepresentation, Defendants also provided forecasts for game purchases from customers allegedly based on past data.  The actual purchases that occurred were consistently much less than what Defendants had either disclosed or forecasted.  Drover knowingly provided forecasts and explanation of sales shortages prior to and after the execution of the APA that he knew were false.  Drover provided sales forecasts before the APA was signed and during his employment that were five to ten times the actual orders received.  When confronted with the actual facts, Drover stated that he wasn't good at remembering numbers, but continued to repeat incorrect numbers to various people inside UGC.   As an experienced seller to these accounts he knew, or should have known, that these forecasted numbers were far beyond reasonable expectations and were not supported by the facts known to him.

49.     In addition, Defendants did not transfer other assets and intellectual property.  After the Forbidden Games acquisition, UGC set up a transition team that would help transfer the Forbidden Games assets and intellectual property to UGC.  As the president of Forbidden Games, Drover knew better than anyone else what had to be transferred to make the transition occur.  In addition, the APA and supporting documents—including the Proprietary Rights Assignment and Bill of Sale—required Defendants to do everything necessary to transfer these assets and

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

15

44205\16457343.2

1   intellectual property.  But much of this never took place.  Defendants did not undertake to transfer

2   to UGC websites, passwords, email addresses, trademarks, and copyrights, among other assets and

3   intellectual property, and refused or ignored UGC's repeated requests to do so.

4           50.     Defendants also failed to transfer the Forbidden Games social media accounts and

5   mailing lists to UGC.  Despite repeated direction from his manager, Craig Hendrickson, and the

6   President and CEO of UGC, Bob Moog, to transfer the remaining assets that UGC acquired in the

7   acquisition, Drover did not transfer the Forbidden Games Kickstarter account, Forbidden Games'

8   Mailchimp account[2] (which contains the Forbidden Games consumer email address list),

9   Forbidden Games' website, or Forbidden Games' email accounts, and refused to provide UGC

10  with access to these accounts, in violation of his contractual obligations.  Mr. Drover also refused

11  to transfer all work-related emails, attachments and files that were on his personal email.  Mr.

12  Drover had a practice (contrary to UGC company policy) to primarily conduct business on his

13  personal email address.  These materials on his email are also confidential UGC material.

14  Although all these accounts other than his personal email were assets acquired by UGC pursuant

15  to the Asset Purchase Agreement, Mr. Drover has still failed to provide UGC with the information

16  required for access to these accounts despite UGC's repeated requests for login information.

17  Specifically, UGC needs Mr. Drover to set up administrator rights for UGC for MailChimp and

18  Dreamhost (the company that hosts Forbidden Games' website), the email vendor/service provider

19  for Forbidden Games, the User IDs for the Forbidden Games email accounts, the passwords for

20  these Forbidden Games email accounts, the logins and passwords for the website, and the logins

21  and passwords for the MailChimp account.

22          51.     On June 13, 2023, UGC launched Faeries & Magical Creatures on Kickstarter.

23  One of the key marketing features and a major source of orders was communicating with existing

24  Forbidden Games customers from previous Kickstarter campaigns.  Upon information and belief,

25  there are over 10,000 customer and prospective customer email addresses maintained by the

---

27  [2] Mailchimp is a service that generates automated emails to a mailing list and securely houses

28  prospective customers' email addresses and contact information.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583                         16                      44205\16457343.2

1   Forbidden Games website and the associated Mailchimp account.  Because Forbidden Games'

2   previous Kickstarter campaigns had successfully made sales to customers on this Mailchimp

3   customer list, the timing of the email solicitations to these potential customers was critical to the

4   success of the Kickstarter campaign for Faeries & Magical Creatures.  But because Drover refused

5   to provide UGC with this account information, UGC was unable to take advantage of the customer

6   list of approximately 10,000 people, many of whom had previously purchased Forbidden Games

7   products, were positively predisposed to Forbidden Games' products, and were people who had

8   previously requested information on Forbidden Games' products.  Drover's lack of cooperation

9   prevented UGC from executing its marketing plan for Faeries & Magical Creatures and caused

10  UGC a significant loss of revenue and severe damage to UGC's relationships with its customers.

11          **D.      UGC's Payments to Distributors and Drover's Indemnification.**

12          52.     Drover and Forbidden Games, under an express indemnification provision in the

13  APA, also owe indemnification to UGC for fulfilling Forbidden Games' previous obligation to

14  reimburse international distributors for shipments made to consumers who purchased products

15  from the Kickstarter campaign prior to UGC's acquisition of Forbidden Games.

16          53.     In April 2021, before UGC and Forbidden Games signed the APA, Forbidden

17  Games entered into several licensing agreements with international distributors for its "Mosaic"

18  line of games.  Section 6 of these Licensing Agreements discussed the Mosaic Kickstarter

19  campaign, under which Drover crowdsourced money through Kickstarter to fund the creation of

20  the Mosaic games, with the promise to deliver this Mosaic game to those who contributed to its

21  creation.  Under Section 6 of these Licensing Agreements, the distributors would eventually ship

22  these products to the customers, but "Forbidden shall reimburse the actual costs for all product

23  shipped to Kickstarter backers, including actual VAT and import fees, and shall pay actual

24  shipping and fulfillment costs related to shipping of the goods."

25          54.     Four of these Licensing Agreements, covering distribution in five countries, were

26  among the Assumed Contracts transferred to UGC as part of the Asset Purchase Agreement under

27  Schedule 2.5.  The Kickstarter shipping costs were also one of the Assumed Liabilities on

28  Schedule 2.3 to the APA.  Section 8.2(a)(iv) of the APA concerns indemnification, and says that

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583                    17                    44205\16457343.2

1   Seller shall indemnify Purchaser for "all of the costs incurred by Purchaser in fulfilling Seller's

2   obligations (assumed by Buyer as described in Schedule 2.3) pursuant to Seller's 2021 Mosiac

3   Kickstarter program…"  Forbidden Games thus owes indemnification to UGC because UGC

4   fulfilled Forbidden Games' obligations under the contract.

5          55.     Drover never transferred the proceeds from the 2021 Kickstarter program, which

6   was completed prior to the acquisition, to UGC.  But UGC still handled the manufacturing and the

7   shipment of all Mosaic products, including the foreign-language versions of the Mosaic game to

8   those distributors so that they could fulfill the orders that Drover received from consumers in their

9   countries.

10          56.     In June 2023, the international distributors began contacting UGC with demands to

11  pay invoices related to their shipment of Mosaic game to customers in their respective countries,

12  after Drover informed these distributors that he was no longer an employee of UGC and directed

13  them to send their invoices to UGC for payment.  The Spanish distributor refused to ship the

14  games to the individual customers who had already paid Drover via the Kickstarter campaign,

15  unless UGC paid in advance for the costs of the product and shipping.  This generated bad will

16  among UGC's distributor and customers, so UGC paid the distributor.  Under Section 8.2(a)(iv) of

17  the APA, Drover is specifically required to indemnify UGC for "all of the costs incurred by

18  Purchaser" in fulfilling these obligations related to the Mosaic Kickstarter program.  Drover thus

19  is required to indemnify UGC for these costs. Similarly, Drover refuses to reimburse UGC for

20  moneys advanced by its UK subsidiary to cover shipment of English-language games and

21  accessories to backers in the UK and Europe.

22                          **FIRST CAUSE OF ACTION**

23          **Declaratory Relief of Ownership of Intellectual Property (Against All Defendants)**

24          57.     Plaintiff incorporates by reference all of the allegations contained in Paragraphs 1-

25  56 as though fully set forth herein.

26          58.     Under California Code of Civil Procedure § 1060 *et seq.,* the Court may declare

27  rights or duties with respect to another under a contract.

28

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583                                18                           44205\16457343.2

59.     An actual, present controversy exists between UGC and Forbidden Games and Glenn Drover as to the parties' respective rights.  UGC believes that it owns all the intellectual property transferred to UGC in the APA and described in Drover's CIIA Agreement, including materials associated with the Faeries & Magical Creatures game.  Forbidden Games and/or Drover have asserted that this intellectual property is theirs and/or his.

60.     Resolution of the parties' respective rights and duties under the APA by declaration of the Court is necessary.

61.     This dispute is sufficiently concrete to make declaratory relief appropriate, and withholding of judicial consideration will result in a hardship to the parties.  Drover has objected to the use of his name in any marketing or sales of the Faeries & Magical Creatures game.  Drover and his attorney have stated several times that this game and UGC's other intellectual property acquired from Forbidden Games belong to Drover and are apparently proceeding with that incorrect understanding.  Drover's attorney sent two letters to UGC, each one claiming that UGC's intellectual property belonged to Drover and demanding that UGC cease production and sale of those materials.

62.     UGC therefore seeks a declaratory judgment that all of the intellectual property that was transferred to UGC in the APA and described in Drover's CIIA Agreement is UGC's intellectual property, and that such property does not belong to Forbidden Games or Drover.

## SECOND CAUSE OF ACTION

### Breach of Contract (Against Forbidden Games)

63.     Plaintiff incorporates by reference all of the allegations contained in Paragraphs 1-56 as though fully set forth herein.

64.     UGC and Forbidden Games entered into a valid and binding contract.  The Asset Purchase Agreement and all related transaction documents make up one valid and binding contract between UGC and Forbidden Games.  Specifically, the Asset Purchase Agreement contains the Bill of Sale, the Proprietary Rights Assignment, and the Non-Compete and Non-Solicitation Agreement.  All of these documents were signed by Glenn Drover on behalf of Forbidden Games.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583                    19                    44205\16457343.2

65.     UGC did all or substantially all of the significant things that the contract required it to do, and substantially performed under the contract.  Among other things, UGC paid Forbidden Games the purchase price set out in Section 2.7 of the APA.

66.     Forbidden Games has breached the contract by failing to do things that the contract required it to do, and by doing things that the contract prohibited.  For example, Forbidden Games breached the APA by, among other things, failing to transfer all the Acquired Assets and intellectual property in violation of the Bill of Sale and Proprietary Rights Assignment, by transferring only three of the nine games in the Acquired IP New Titles In Development 2021-2025 in violation of the Proprietary Rights Assignment, by failing to execute and deliver all documentation or filings necessary to be filed with governmental bodies to transfer this intellectual property, by failing to transfer access to the Forbidden Games' accounts and social media to UGC, by failing to return UGC company property, and by asserting that UGC's intellectual property is its own in violation of its obligation to transfer all ownership of such intellectual property.

67.     Upon information and belief, in violation of the Non-Compete Agreement (a part of the APA), Forbidden Games and/or Glenn Drover on its behalf has been or is preparing to develop, sell, market, and distribute games with substantially similar names, look, and feel as those games included in the Acquired Assets purchased by UGC under the Asset Purchase Agreement.  Upon information and belief, Forbidden Games and/or Glenn Drover on its behalf has been or is preparing to become an officer, director, member, owner, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, any firm, partnership, corporation, person, entity or business that engages or participates in competing with UGC.  Upon information and belief, Forbidden Games and/or Glenn Drover on its behalf has been or is preparing to contact, solicit or communicate with UGC's customers in connection with competing with UGC.

68.     UGC has been harmed by Forbidden Games' breach of contract.  UGC has lost revenue from game releases and has suffered reputational harm.  Forbidden Games' breach of

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT                           20
Case No. 3:23-cv-05583

44205\16457343.2

contract was a substantial factor in causing UGC harm and has caused damages in amounts according to proof at the time of trial.

## THIRD CAUSE OF ACTION

### Breach of Contracts (Against Glenn Drover)

69.     Plaintiff incorporates by reference all of the allegations contained in Paragraphs 1-56 as though fully set forth herein.

70.     UGC and Glenn Drover entered into several valid and binding contracts.  The Non-Compete and Non-Solicitation Agreement was signed by Glenn Drover in his individual capacity as a "shareholder" of Forbidden Games.  Drover also signed his Employment Offer Letter and the Employee Confidential Information and Inventions Agreement in his individual capacity.

71.     UGC did all, or substantially all, of the significant things that the contracts required it to do.  Among other things, UGC paid Forbidden Games the purchase price set out in Section 2.7 of the APA, paid Drover a salary, and paid 2022 royalties to Drover in full and on time.

72.     Drover breached the contracts by failing to do things that the contracts required him to do, and by doing things that the contracts prohibited.

73.     Drover breached his Employment Offer Letter by, among other things, failing to perform his job responsibilities, failing to abide by Company rules and policies, failing to comply with the Employee Confidentiality and Non-Disclosure Agreement, and by his unauthorized use of UGC's proprietary information.

74.     Drover breached the Employee Confidential Information and Inventions Agreement by, among other things, failing to assign any and all intellectual property developed on UGC time for UGC, improperly claiming these works for hire as his own intellectual property, failing to return company property upon the termination of his employment, including emails and other information that exists on Drover's personal Gmail account, and failing to transfer Forbidden Games email and social media accounts to UGC both before and after his termination of employment.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

21

44205\16457343.2

75. Drover breached the Non-Compete Agreement by, among other things, competing with UGC while employed by UGC and after his termination of employment. Upon information and belief, Drover has been or is preparing to develop, sell, market, and distribute games with substantially similar names, look, and feel as those games included in the Acquired Assets purchased by UGC under Asset Purchase Agreement. Upon information and belief, Drover has been or is preparing to become an officer, director, member, owner, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, any firm, partnership, corporation, person, entity or business that engages or participates in competing with UGC. Upon information and belief, Drover has been or is preparing to contact, solicit or communicate with UGC's customers in connection with competing with UGC.

76. UGC has been harmed by Drover's breach of contract. UGC has lost out on revenue from game releases and has suffered reputational harm from Drover's interference with its customers. Drover's breach of contract was a substantial factor in causing UGC harm and has caused damages in amounts according to proof at the time of trial.

<strong><u>FOURTH CAUSE OF ACTION</u></strong>

<strong><u>Breach of Fiduciary Duties of Loyalty and Good Faith (Against Glenn Drover)</u></strong>

77. Plaintiff incorporates by reference all of the allegations contained in Paragraphs 1-56 as though fully set forth herein.

78. Glenn Drover was an employee of UGC and Vice President of the Strategy Game Division, with managerial responsibilities and a role on the senior management team of UGC. Drover owed fiduciary duties of loyalty and good faith to his employer, UGC.

79. Glenn Drover breached his fiduciary duties of loyalty and good faith by knowingly acting against UGC's interests by, among other things, unilaterally deciding to not perform some of his job responsibilities, proposing a new role for himself doing less with a higher salary, failing to transfer Forbidden Games' assets and intellectual property to UGC, and holding the Faeries game development hostage until his monetary demands were met. Drover also acted against

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

22

44205\16457343.2

1   UGC's interests by demanding that UGC not use his name in connection with the development,

2   promotion, and marketing of the game Faeries & Magical Creatures, and by claiming the game's

3   intellectual property as his own, both while employed by UGC and after his employment ended.

4   Upon information and belief, Drover also acted against UGC's interests by working on behalf of

5   potential companies he, upon information and belief, was hoping to start or did start, whose

6   interests were adverse to UGC in the game development business.

7       80.     UGC was harmed by Drover's conduct, which was a substantial factor in causing

8   UGC's harm.

9                           **FIFTH CAUSE OF ACTION**

10                          **Fraud (Against All Defendants)**

11      81.     Plaintiff incorporates by reference all of the allegations contained in Paragraphs 1-

12  56, particularly those in paragraphs 43-51, as though fully set forth herein.

13      82.     Defendants made multiple material misrepresentations at the time they entered into

14  the APA in order to induce UGC to enter into the contract, and Defendants made promises they

15  had no intention of keeping both before and after they entered into the APA.

16      83.     Defendants made material misrepresentations during the negotiation of the APA

17  and within the APA, including:  Defendants did not disclose all their pre-existing liabilities and

18  then attempted to have UGC pay those liabilities after the transaction had closed; Defendants did

19  not list all material contracts as required by the APA, including those "relating to the purchase of

20  goods or services in excess of" a certain amount; Defendants listed on the APA "New Titles in

21  Development 2021-2025" that they represented were in development, but which were not in

22  development at all and had never been started; Defendants provided forecasts for game purchases

23  from customers allegedly based on past data, but the actual purchases that occurred were

24  consistently much less than what Defendants had either disclosed or forecasted.

25      84.     Defendants made material false promises with no intention of keeping those

26  promises, including:  Defendants never undertook to transfer to UGC its assets and intellectual

27  property, including websites, passwords, email addresses, trademarks, and copyrights, among

28  other assets, and refused or ignored UGC's repeated requests to do so in violation of their

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT                    23                    44205\16457343.2
Case No. 3:23-cv-05583

1   contractual obligations; upon information and belief and a reasonable investigation, Defendants

2   secretly switched the bank account associated with the Stripe account so that payments that

3   Defendants agreed should be made to UGC were instead made to Forbidden Games' bank

4   account.

5        85.    Defendants made these material misrepresentations and false promises with

6   knowledge of their falsity or reckless disregard of their truth.

7        86.    Defendants made these material misrepresentations and false promises in order to

8   induce UGC to act in reliance on this false information.  Defendants wanted UGC to enter into the

9   APA, pay the purchase price at closing, and pay the first and second post-transaction payments on

10  an accelerated schedule, and Defendants' material misrepresentations and false promises were

11  partially made in order to induce UGC to take these actions.

12       87.    UGC actually and justifiably relied on Defendants' misrepresentations and false

13  promises in deciding to enter into the APA, in entering the APA, and in its business dealings post-

14  transaction with Defendants and other parties.

15       88.    UGC was harmed by its reliance on Forbidden Games and Drover's material

16  misrepresentations and false promises, which were a substantial factor in causing UGC harm.

17  <u>**SIXTH CAUSE OF ACTION**</u>

18  <u>**Express Indemnification (Against Forbidden Games)**</u>

19       89.    Plaintiff incorporates by reference all of the allegations contained in Paragraphs 1-

20  88 as though fully set forth herein.

21       90.    The APA contains an indemnification clause stating that Seller (Forbidden Games)

22  shall indemnify Purchaser (UGC) to the extent that the losses arise from the failure of any

23  representation or warranty of Forbidden Games, the material breach by Forbidden Games of any

24  covenants contained in the Agreement, fraud or willful misconduct by Forbidden Games, and all

25  of the costs UGC incurs in fulfilling Forbidden Games' obligations pursuant to the Mosaic

26  Kickstarter program to deliver certain Mosaic games.  (Exhibit A, APA at § 8.2(a).)

27       91.    UGC has incurred damages based on Forbidden Games' breaches of its obligations

28  in the APA, fraud and willful misconduct by Forbidden Games, and the costs of fulfilling

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT
Case No. 3:23-cv-05583

24

44205\16457343.2

1    Forbidden Games' obligations regarding the Mosaic Kickstarter campaign.  UGC's need for

2    indemnification is thus caused by the fault of Forbidden Games, and Forbidden Games is

3    contractually and equitably responsible for the resulting damages to UGC.

4    **VI.    <u>JURY DEMAND</u>**

5         UGC hereby respectfully demands a trial by jury of all issues so triable pursuant to Rule 38

6    of the Federal Rules of Civil Procedure.

7    **VII.    <u>PRAYER FOR RELIEF</u>**

8         WHEREFORE, University Games Corporation prays for judgment against Defendants

9    Forbidden Games and Glenn Drover as follows:

10        1.   For a declaration that all the assets and intellectual property described as

11   transferred to UGC in the Asset Purchase Agreement and associated transaction

12   documents, as well as all the assets and intellectual property described as belonging to

13   UGC in Drover's Employee Confidential Information and Inventions Agreement,

14   belongs to UGC and does not belong to Mr. Drover or Forbidden Games;

15        2.   For an order requiring specific performance for Drover and Forbidden

16   Games to complete whatever remaining transfer documents are necessary to be filed to

17   transfer all assets and intellectual property to UGC, and cooperate with UGC in this

18   pursuit;

19        3.   For an order requiring specific performance for Drover and Forbidden

20   Games to transfer and return all company assets, emails, and online accounts to UGC's

21   control in accordance with their contractual obligations;

22        4.   For an order enjoining Drover and Forbidden Games from using UGC's

23   intellectual property or online accounts as their own, including using UGC's mailing

24   lists of potential customers;

25        5.   For damages in excess of $75,000;

26        6.   For prejudgment interest according to law;

27        7.   For reasonable attorneys' fees and costs, as authorized by the applicable

28   contracts and the law;

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

UGC'S COMPLAINT                                25
Case No. 3:23-cv-05583

44205\16457343.2

8. For restitution and disgorgement of Drover and Forbidden Games' unjust enrichment, in an amount to be proven at trial;

9. For any and all other relief that the Court deems just and proper.

Dated: October 30, 2023

FARELLA BRAUN + MARTEL LLP

By: _____
        Thomas B. Mayhew

Attorneys for UNIVERSITY GAMES CORPORATION

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400